Arcadio **RODRIGUEZ** and
Jean Rodriguez, his
wife, Plaintiffs,

v.

**CIGNA PROPERTY AND CASUALTY
COMPANY, Defendants.**

No. 3:93–CV–1377.

United States District Court,
M.D. Pennsylvania.

Nov. 26, 1996.

Robert J. Gillespie, Jr., Mylotte, David & Fitzpatrick, Wilkes–Barre, PA, for Plaintiffs.

Richard A. Polachek, Law Offices of Jordan H. Pecile, Wilkes–Barre, PA, for Defendants.

1. This action is before the magistrate judge for

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION

DURKIN, United States Magistrate Judge.

This action is now before the court for decision following trial to the court without a jury.[1]

### FINDINGS OF FACT

#### I. BACKGROUND

Plaintiffs, residents of Florida, were involved in an automobile accident on January 13, 1991, on Pennsylvania Route 940 in Hazle Township, Luzerne County, Pennsylvania, after having attended a viewing for a deceased relative. At the time, plaintiffs were passengers in a vehicle being operated by Kenneth Harold Robers, Jr., of Cooper City, Florida. The accident was an intersection accident involving two (2) cars. The vehicle occupied by plaintiffs was struck on the rear passenger side of the vehicle. The operator of the other vehicle was Cecilia Chitswara of Drifton, Pennsylvania.

A third party action was filed against both drivers and the matters were resolved by way of settlement. Plaintiff, Arcadio Rodriguez, received a total sum of Thirty–Five Hundred Dollars ($3,500.00) for his injuries and the plaintiff, Jean Rodriguez, received a total sum from both liability carriers of Forty–One Thousand Five Hundred Dollars ($41,500.00). After having received policy limits from the tortfeasor and exhausting the underinsured motorists policy on the automobile in which they were riding, they now seek underinsured benefits from a policy of insurance they had with defendant, CIGNA Property and Casualty Company.

#### II. STIPULATED FACTS AND OTHER MATTERS

1. Florida law applies, and in particular, the Florida No–Fault/Uninsured Motorist Act applies.

2. A true and correct copy of the policy of insurance that is applicable in this case has been attached to defendant's trial brief and marked as Exhibit "A".

all purposes with the consent of the parties.

3. Plaintiff, Jean Rodriguez, has submitted medical bills to CIGNA in the amount of Two Thousand Five Hundred Forty–Nine Dollars and Fifty-one Cents ($2,549.51), which were paid. Plaintiff, Arcadio Rodriguez, has submitted medical bills of Seven Hundred Seventy–Four Dollars and Twenty-five Cents ($744.25) to CIGNA which were paid. Both individuals have medical payment limits of Five Thousand Dollars ($5,000.00).

4. No medical bills were sent to CIGNA with regard to any treatment Mrs. Rodriguez had for rheumatoid arthritis.

5. In the underlying action, Arcadio Rodriguez was paid the sum of Thirty–Five Hundred Dollars ($3,500.00). Plaintiff, Jean Rodriguez, was paid the total sum of Forty–One Thousand Dollars Five Hundred Dollars ($41,500.00).

6. The rib fracture injuries and Pneumothorax injuries sustained by plaintiff, Jean Rodriguez, in the motor vehicle accident completely resolved by the end of February, 1991.

7. The total policy limits under the CIGNA policy of insurance at issue is Three Hundred Thousand Dollars ($300,000.00) per accident.

8. Florida Motor Vehicle No–Fault Law (627.730–627.7405) provides in pertinent part as follows:

> **"Recovery for pain, suffering, mental anguish, and inconvenience is allowed where injury results in permanent loss of bodily function, permanent injury, significant permanent scarring or disfigurement, or death (627.737)."**

9. The parties agree that the sole issue before the court is whether or not both plaintiffs have overcome the tort threshold in order to have a claim for pain and suffering, mental anguish and inconvenience.

10. The parties agree that there is the need to establish permanence of injuries to recover for the items of damages specified.

### III. *CLAIM OF ARCADIO RODRIGUEZ*

11. Arcadio Rodriguez is currently sixty-two years, born August 4, 1934, married and resides in Key West, Florida, with his wife, Jean. He is a graduate of Key West High School and the University of Florida with a bachelor of science degree in business administration.

12. In 1973, Mr. Rodriguez went into his own business, a tire dealership which engages in tire sales and mechanical work. Mr. Rodriguez has seven (7) employees including his brother who is a master mechanic and oversees the mechanical aspect of the business. He also employs his son who is the service manager. Mr. Rodriguez oversees the business which includes taking care of the books, paying the bills, balancing the checkbook, doing paperwork and ordering supplies.

13. Immediately following the accident, Mr. Rodriguez was treated at an Emergency Room on January 13, 1991, and released. He was diagnosed with acute, right lower leg abrasion and abrasion to the right knee. Mr. Rodriguez was advised to see Dr. Lease, a local orthopedic surgeon, if swelling continued and also to apply ice packs to the affected area. Two days later, he was seen by Dr. Lease.

14. By way of history to Dr. Lease, Mr. Rodriguez in part advised the doctor that his leg was bothering him very little, essentially not at all. He advised the doctor that he could walk without difficulty. On examination, Mr. Rodriguez walked with a normal gait and was able to do a deep knee bend. The range of motion of the knee was also full and there was no affusion. There was also normal ligamentous stability to the varus and valgus stress and lachman testing and stressing also of posterior cruciate ligament. There was also very slight pain on stress of the medical collateral ligament.

15. Upon x-ray to the right knee, Dr. Lease noted radiodense bodies adjacent to the medial femoral condyle and adjacent to the posterior spine of the intra-condylar notch. The doctor felt that this was an *old* injury, rather than new. (This opinion was also later shared by Dr. John Lockwood of Key West, Florida, who saw Mr. Rodriguez on January 28, 1991, and also by Dr. Robert

Catana who saw Mr. Rodriguez on August 1, 1996).

16. The day after being seen by Dr. Lease, Mr. Rodriguez and his wife returned to their residence in Key West, Florida.

17. Mr. Rodriguez was seen by Dr. John Lockwood of Key West on January 28, 1991, or some fifteen (15) days later. The doctor noted that Mr. Rodriguez was in motor vehicle accident two weeks previously with local contusion and a sprain to the right knee. The doctor also noted that x-rays reviewed appeared to show *old* injuries to the bone at the medial collateral ligament origin, but also noted that the ligaments were all stable to examination. He also noted that there was no significant mechanical disruption and there was no pain as well.

18. The testimony also revealed that Mr. Rodriguez was scheduled to see Dr. Lockwood on February 20, 1991, but Mr. Rodriguez did not show. He was then seen on March 20, 1991 and then four and one-half years later, or on October 6, 1995. Mr. Rodriguez explained in his testimony that he saw Dr. Lockwood four and one-half years later in order to get an update report since the trial in the instant case was scheduled to take place November or December, 1995. This was the only purpose of the exam. However, many attempts by counsel to take the telephonic deposition of Dr. Lockwood for use at trial were unsuccessful. Plaintiff testified that although he plays golf with Dr. Lockwood, he could not get Dr. Lockwood to submit to the depositions because he "hates lawyers."

19. After a firm trial date was set, Mr. Rodriguez testified that he was seen for the first time by Dr. Robert Catana on August 1, 1996, or some five and one-half years after the accident. The sole purpose of this exam was to obtain an updated report and to have Dr. Catana testify at the time of trial.

20. Defendant had Mr. Rodriguez seen and examined on January 12, 1994 by Dr. David Cooper, an orthopedic surgeon, of Wilkes–Barre, Pennsylvania. Many normal findings were noted. Dr. Cooper also reviewed x-rays of January 28, 1991, as well as emergency room records and records of Dr.

Lease. Dr. Cooper opined that Mr. Rodriguez sustained a contusion of his leg as a result of the accident. He also indicated that it was "possible" that he might have aggravated some underlying arthritis or chondromalacia (degeneration of the kneecap). He stated that the latter condition was supposition only because there was no arthroscopy. Dr. Cooper stated that the contusion was not a permanent injury and *if* there was a little traumatic chondromalacia, that would not be a permanent condition either. The doctor also noted that Mr. Rodriguez' injuries did not constitute a permanent loss or bodily function.

21. Mr. Rodriguez did not miss any work on account of the injury to his knee as a result of this accident.

22. Mr. Rodriguez also advised Dr. Cooper that he was quite active and does a lot of activities including golfing.

23. Mr. Rodriguez admitted that he still plays golf and also testified that he goes out in his boat every weekend and fishes, snorkels during lobster season, and rides horseback up to 2–3 hours at a time.

24. Mr. Rodriguez did not suffer any permanent loss of bodily function, permanent injury or significant permanent scarring or disfigurement as a result of the accident. (Findings based on direct testimony and/or inferences to be drawn from above evidence including emergency room findings, Dr. Lease findings and diagnosis, Dr. Lockwood's initial findings and diagnosis, Dr. Cooper's testimony, Mr. Rodriguez' work and recreational activities).

## IV. CLAIMS OF JEAN RODRIGUEZ

25. Jean Rodriguez is currently sixty years of age, born August 20, 1936, and resides with her husband in Key West, Florida.

Mrs. Rodriguez is a graduate of Hazleton High School and St. Joseph's School of Nursing. She also took real estate courses in 1974 at the Florida Keys Community College and, subsequently, secured her real estate license.

26. Mrs. Rodriguez has not worked in the nursing field since the 1960's. After taking

real estate courses and obtaining her license, she worked for various real estate agencies from 1974 through the spring of 1993 when the last agency was sold. She then joined Key West Realty as an independent contractor salesman/broker where she "makes her own hours." She still holds her license.

27. Immediately following the automobile accident, Mrs. Rodriguez was treated at the emergency room on January 13, 1991 and released. Diagnosis: Acute right rib fractures. At that time, she denied neck pain, denied chest discomfort, and denied numbness or tingling of the extremities which included her legs, feet, arms and hands.

28. Mrs. Rodriguez and her husband returned to Key West by plane on or about January 16, 1996.

29. Mrs. Rodriguez was then admitted to the Florida Keys Memorial Hospital on or about January 16 or 17 to January 19, 1991. Her admission was due to the trauma to her right chest and her complaints of increased pain. An x-ray revealed a right pleural effusion with an estimated 20 percent pneumothorax. The diagnosis was a hemopneumothorax as a result of chest trauma which was treated symptomatically.

30. She was further seen at the hospital on January 22, 1991, January 25, 1991 and February 4, 1991, so that blood tests, x-rays, and breathing test could be done because of her pneumothorax condition. The pneumothorax condition completely resolved by the end of February of 1991.

31. Mrs. Rodriguez, in her answers to Interrogatories and her deposition testimony in the trial, admitted that the fractured ribs and pneumothorax completely healed at the end of February, 1991, or some six weeks later.

32. Mrs. Rodriguez' claim in this action is that she has sustained the permanent injury of rheumatoid arthritis which was caused or at least aggravated by the accident.

33. Mrs. Rodriguez' family physician at the time was Dr. Robert Carraway of Key West, Florida. Mrs. Rodriguez, in April, 1991, had an abrupt onset of symmetrical polynynovitis associated with five hours of morning stiffness, a gelling phenomenon, and progressive loss of motion about her shoulders with marked pitting edema about her neck.

34. As a consequence, Dr. Carraway sent Mrs. Rodriguez to be seen by Dr. Jerry Rosenbaum, a rheumatologist, who saw Mrs. Rodriguez on May 8, 1991. He testified that she told him she developed swelling in the hands and feet one month prior to May 8, 1991. He diagnosed Mrs. Rodriguez as acute onset of zero rheumatoid arthritis with an onset of April of 1991, or three months after the motor accident.

35. On July 18, 1991, plaintiffs' counsel wrote to Dr. Rosenbaum to inquire whether her arthritic condition was causally connected to the accident. When Dr. Rosenbaum did not respond, counsel again inquired on September 26, 1991. Dr. Rosenbaum in a brief note replied "the auto accident did not cause her rheumatoid arthritis."

36. Dr. Katz who saw Mrs. Rodriguez on 2 or 3 occasions, the first in December 1991, testified that his file revealed that Mrs. Rodriguez told him that she had rheumatoid arthritis prior to the accident.

37. Dr. Martin D. Blidner, F.A.C.P., Chief, Department of Rheumatology and Chief, Division of Medicine, Geisinger Medical Center, Wilkes–Barre, testified that his opinion was that there was no cause/effect relationship between trauma and rheumatoid arthritis. He noted that rheumatoid arthritis is a chronic inflammatory arthritis associated with various demonstrable abnormalities in a patient's immune system. There are known predisposing factors such as family background of connective tissue disease, specific genetic markers related to the genes which control the immune system, and female gender. He noted that trauma has never been significantly proven in controlled large studies to be an etiologic factor for rheumatoid arthritis. He noted that rheumatoid arthritis is a relatively common type of inflammatory arthritis affecting nearly one million people in the United States. In addition, motor vehicle accidents are extremely common. The doctor noted by serendipity, one expects to see patients developing rheumatoid arthritis after automobile accidents. This is by

virtue of the statistical probability that such events will occur. However, anecdotal reports and individual cases is by no means scientific proof of an etiologic risk factor given the likelihood that two common events will occasionally simultaneously occur.

38. Dr. Blidner reviewed medical reports or records of various physicians who had seen plaintiff, including the records of Dr. Carraway which indicated that Mrs. Rodriguez had a family history of systemic lupus erythematosus *and* rheumatoid arthritis.

39. Dr. Blidner testified that this family history was significant because people with rheumatoid arthritis have a higher frequency of family members with rheumatoid arthritis or similar type diseases.

40. Dr. J. Teig–Port, an orthopedic surgeon, Clarks Summit, Pennsylvania, testified that Mrs. Rodriguez was treated at the Hazleton General Hospital, as well as her subsequent admission to the Florida Keys Memorial Hospital in mid–January of 1991 for a direct complication of her injuries suffered in the motor vehicle accident. However, Mrs. Rodriguez's subsequent work-up for general malaise and for evaluation of what turned out to be rheumatoid arthritis are not related to the motor vehicle accident. Mrs. Rodriguez's complaints in her joints are related to rheumatoid arthritis. Rheumatoid arthritis is a condition which is marked by an abnormality in the immune system in which one portion of the immune system attacks another. The onset of this condition is not related to the trauma. The known risk factors for rheumatoid arthritis are genetic predisposition, female sex, Caucasian race, and a certain genotype which is characterized by a specific genetic marker. Again, the doctor noted that trauma is not a known factor relative to cause or onset of rheumatoid arthritis. He also disagreed with Dr. Katz that quiescent rheumatoid arthritis could flare up, and worsen due to trauma.

41. Dr. David R. Cooper, orthopedic surgeon, Wilkes–Barre, Pennsylvania. Dr. Cooper completely agreed with Dr. Tieg–Port and noted that rheumatoid arthritis is an event which has multiple etiologies, but basically is genetically controlled, and the onset is most common between the ages of 20 and 50, but that rheumatoid arthritis cannot be caused or precipitated by a traumatic event, such as a contusion to the rib cage or fractured ribs. He noted that rheumatoid arthritis is multiple joint involvement basically including all articular joints covered with synovium. The doctor noted that a direct blow to the chest in no way is going to affect the joints of the feet or arms or neck and there is no evidence of any additional injury. The doctor concluded that her condition of rheumatoid arthritis diagnosed after the accident is not in any way related to any direct result of the motor vehicle accident since rheumatoid arthritis cannot be precipitated by trauma. He also noted existing rheumatoid arthritis cannot be aggravated by trauma, although trauma can cause synovitis which is a self limiting condition. He testified, however, that arthritis is an auto immune phenomena not related to trauma.

42. The only related injuries plaintiff, Jean Rodriguez, sustained as a result of the motor vehicle accident in question, were fractured ribs and pneumothorax, and these injuries completely resolved by the end of February, 1991, or six weeks after the motor vehicle accident. The rheumatoid arthritis was not caused, aggravated or permanently aggravated or precipitated by the motor vehicle accident in question. (Findings based on direct testimony and/or inferences to be drawn from above evidence including emergency room findings, early reports of Dr. Rosenbaum, plaintiff's admission of pre-existing rheumatoid arthritis condition, and testimony of Dr. Blidner, Dr. Tieg–Port and Dr. Cooper.)

43. Jean Rodriguez' injuries sustained in the motor vehicle accident did not amount to permanent loss of bodily function, permanent injury, significant permanent scarring, or disfigurement or death. (Findings based on direct testimony and/or inferences to be drawn from above evidence including emergency room findings, early reports of Dr. Rosenbaum, plaintiff's admission of pre-existing rheumatoid arthritis condition, and testimony of Dr. Blidner, Dr. Tieg–Port and Dr. Cooper.)

## DISCUSSION

Plaintiffs argue that under Florida law, when the proponent of permanency supports the hypothesis with expert testimony, the opponent of permanency, in order to carry the issue to the jury (factfinder), must either present countervailing expert testimony; severely impeach the proponent's expert; or present other evidence which creates a direct conflict with the proponent's evidence, citing *Jarrell v. Churm*, 611 So.2d 69 (Fla.App. 1992). The defendant clearly produced expert and other evidence which, when considered with all the evidence, preponderates in its favor and establishes its right to judgment.

The decision in this case turns in large part upon what medical evidence will be credited. The parties elected to present the medical evidence to the court by way of deposition transcript. Thus, in the absence of live testimony or video deposition testimony, demeanor is not factor.

Plaintiffs have placed in evidence the April 13, 1995 deposition of Dr. Katz, an internist and rheumatologist whose testimony addressed Mrs. Rodriguez' rheumatoid arthritis and who opined that her rheumatoid arthritis was exacerbated by trauma from the accident, and the October 15, 1996 deposition testimony of Dr. Catana, an orthopedist whose testimony addressed Mr. Rodriguez' knee condition. Plaintiffs also relied in part on the October 10, 1995 deposition testimony of Dr. Rosenbaum, a rheumatologist, concerning plaintiff's rheumatoid arthritis, which was placed in evidence by defendant.

Defendant has placed in evidence the August 28, 1995 deposition testimony of Dr. Tieg–Port, an orthopedist whose testimony addressed Mrs. Rodriguez's rheumatoid arthritis, the August 29, 1995 deposition testimony of Dr. Blidner, an internist and rheumatologist whose testimony addressed Mrs. Rodriguez's rheumatoid arthritis condition, the October 10, 1995 deposition testimony of Dr. Rosenbaum whose testimony addressed Mrs. Rodriguez's rheumatoid arthritic condition, and the August 15, 1996 deposition of Dr. Cooper, an orthopedic surgeon whose testimony addressed both Mr. Rodriguez's knee condition and Mrs. Rodriguez's rheumatoid arthritic condition.

As noted above in the numbered findings of fact, the court has summarized and finds in accordance with the testimony of Dr. Tieg–Port, Dr. Blidner, Dr. Cooper and, in part, the testimony of Dr. Rosenbaum, all of whom disagreed with Dr. Katz concerning the cause of Mrs. Rodriguez' rheumatoid arthritis, and thus this testimony will not be repeated. Rather, this discussion will be limited to reasons why the court did not find in accordance with the testimony and opinions of Dr. Catana, regarding Mr. Rodriguez' knee condition, and Dr. Katz, and in part, Dr. Rosenbaum concerning Mrs. Rodriguez' rheumatoid arthritis.

█ As noted above, the evidence established that Mr. Rodriguez did not suffer a permanent injury, permanent loss of bodily function, or the like. (See Finding of Fact No. 24). Opposed to this evidence is only the testimony of Dr. Catana. Dr. Catana's testimony is based on an examination performed in August 1996 or, five and one-half years after the accident, and after Mr. Rodriguez was unsuccessful in having Dr. Lockwood, who saw Mr. Rodriguez in Florida shortly after the accident, submit to a deposition. Although Dr. Catana felt that any contusion to the chondromalacia patella had been resolved at that time, he was of the opinion that clinically plaintiff had a medial meniscus tear sustained in the accident and suggested that plaintiff have an MRI done to try "to ascertain what, if any, soft tissue injury" Mr. Rodriguez may have, but that plaintiff did not want an MRI. Dr. Catana also noted that in 1991, Mr. Rodriguez also rejected the suggestion of Dr. Lockwood that an MRI be performed. Dr. Catana also indicated that Mr. Rodriguez rejected his suggestion that he have an arthroscopic procedure.

Dr. Catana had reviewed the records of the emergency room and Dr. Lease which were developed shortly after the accident and the records of Dr. Lockwood which were developed within a few weeks of the accident. Dr. Catana acknowledged that all of these physicians found no medial meniscus tear. Dr. Catana also admitted that Dr. Cooper in January 1994 found no tear. When it was

pointed out to Dr. Catana that Dr. Lockwood's examination revealed many negative findings and no pain, Dr. Catana admitted that these findings were inconsistent with his own findings in the sense that "he had pain on the medial or inner joint space when I saw him" in August 1996.

Dr. Catana agreed that if plaintiff had a trauma to the knee in the motor vehicle accident, he would have had pain thirteen days later when Dr. Lockwood saw him. Dr. Catana acknowledged that since none of the doctors who examined plaintiff immediately or within a few days or weeks after the accident diagnosed a torn medial meniscus, it was "possible" that the condition Dr. Catana diagnosed could have occurred some time after the accident. Although Dr. Catana was not familiar with plaintiff's activities to a great extent, he did note that plaintiff "likes to play golf" and that a swing or twist the wrong way could result in a torn medial meniscus. Moreover, as noted above in the specific findings, Mr. Rodriguez golfs, snorkels, engages in boating on weekends and rides horseback up to three hours at a time.

In view of the above, the testimony of Dr. Catana was not credited.

■ As noted above, the medical and other evidence also established that Mrs. Rodriguez's rheumatoid arthritis was not a condition caused or aggravated by the accident. (See Findings of Fact 42 and 43). Opposed to this was only the testimony of Dr. Katz and, in part, Dr. Rosenbaum.

With respect to the testimony of Dr. Katz, Dr. Rosenbaum referred Mrs. Rodriguez to Dr. Katz. He first saw Mrs. Rodriguez on December 2, 1991 or eleven months after the accident. In his *initial* reports, he indicated that "in that there was a temporal relationship between the onset of her rheumatoid arthritis within six weeks of the accident, then there is a likely cause-effect relationship. That is my opinion, the rheumatoid arthritis was precipitated by the accident. This type of phenomenon has been reported in the past, however, there have been no large scale studies." However, at his deposition, Dr. Katz testified that he was not aware at the time of his initial examination and when he gave the above opinion that plaintiff

had rheumatoid arthritis prior to the accident, and that he learned this at a later time. He then changed his position. He noted that the condition was not "precipitated" by the accident, but rather "aggravated" by the accident. He testified that it is his opinion that "Mrs. Rodriguez' rheumatoid arthritis, previously relatively quiescent, flared as a result of the proximate injury as described in this case. The ultimate worsened course and prognosis were directly related to that injury." At another point he stated that "[t]rauma, such as a motor vehicle accident, can either cause, in my opinion, rheumatoid arthritis in patients who have never had rheumatoid arthritis before or certainly, and this is more common, can cause a flare of preexisting rheumatoid arthritis." He then appeared to have changed his opinion for a third time in that he indicated that it was not trauma, as such, that can aggravate rheumatoid arthritis, but rather it is stress and that "trauma is one form of stress."

Various of the defendant's physicians had indicated that there were no large scale studies which ever concluded that there is a relationship between trauma and rheumatoid arthritis. Dr. Katz agreed that there are no large scale studies to support his opinion, although he did indicate that there are studies "that speak to the relationship between trauma and rheumatoid arthritis." However, he did not testify, for example, that these studies were generally recognized in the medical community as establishing the relationship. He disagreed with the opinions of defendant's physicians that trauma could not precipitate or aggravate rheumatoid arthritis, although he agreed with Dr. Blidner that rheumatoid arthritis is a capricious disease in which the exact ideology has never been conclusively established.

Although plaintiffs argue that Dr. Tieg–Port noted that Mrs. Rodriguez' arthritis would prevent her from being on her feet eight hours a day, he clearly testified that this condition was not caused by the accident. Although plaintiffs argue that Dr. Blidner was unable to give an opinion as to whether "trauma and/or stress is a precipitating factor in RA," Dr. Blidner's testimony was in answer to a question as to whether *stress*

could be a causation factor and not "trauma and/or stress."

Because of these factors, I find the testimony of the physicians relied upon by defendant to be more credible than that of Dr. Katz.

As noted above in the specific findings, Dr. Rosenbaum testified that when he saw plaintiff in May 1991, based on Mrs. Rodriguez' representations to him, he felt that there was an acute onset of rheumatoid arthritis in April 1991 and that it was not related in any way to the automobile accident of January 1991. He persisted in this opinion through September 1991.

However, in his subsequent deposition, he stated that at some unspecified time after September 1991 ("in '92, '93, '94"), Mrs. Rodriguez gave him more information regarding the onset of her symptoms which indicated to him that there could be a relationship between rheumatoid arthritis and the trauma of the accident. When asked whether there were any other rheumatologists who don't share that opinion, he did not answer that question directly, but instead stated "It's highly controversial. There is literature to suggest that trauma does cause rheumatoid arthritis. And if there is a temporal association, then I am comfortable making that statement." He too did not indicate whether this literature is generally accepted in the medical community. When counsel delved further into this "controversy" he replied "We don't know what causes it." Thus, the court accepts only that part of Dr. Rosenbaum's testimony which indicated there was no causal relationship between the accident and Mrs. Rodriguez' rheumatoid arthritis, which is corroborated by the testimony of the other physicians proffered by defendant.

To the extent that the information related by Mrs. Rodriguez to her physicians by way of history would enter into any diagnosis, particularly by Dr. Rosenbaum who changed his opinion based on "more information" given him by plaintiff, as noted above, Dr. Katz indicated that he did not learn on plaintiff's first visit that plaintiff suffered from rheumatoid arthritis prior to the accident, but learned this during her second visit in 1993 or third and last visit in 1994. Dr. Rosen-

baum at his deposition in 1995 testified that he had *no* information that plaintiff had rheumatoid arthritis before the accident. Mrs. Rodriguez testified that Dr. Katz's records were "incorrect" when Dr. Katz noted that plaintiff had rheumatoid arthritis before the accident and that Dr. Rosenbaum's records were "incorrect" when Dr. Rosenbaum noted on her first visit that she had told him that the onset of her symptoms was in April 1991, one month before she saw Dr. Rosenbaum. However, her denials that she gave this information, contained in the doctor's records, cannot be accepted since it does not appear to be the type of information on which a physician could be mistaken particularly since history is an important part of information which goes into a doctor's diagnosis. Moreover, there is nothing to indicate that plaintiff ever told Dr. Katz or Dr. Rosenbaum about a history of rheumatoid arthritis in *her family*, information which was before Dr. Blidner.

## CONCLUSIONS OF LAW

1. The dispute in this case is governed by Florida law including the Florida No-Fault/Uninsured Motorist Act.

2. Based upon the above findings of fact as applied to the law in this matter, plaintiffs Arcadio Rodriguez and Jean Rodriguez are not entitled to recover for underinsurance benefits against defendant CIGNA Property and Casualty Company.

3. An appropriate judgment in favor of CIGNA Property and Casualty Company will be issued.

## JUDGMENT

This action came on for trial before the court, and the issues having been duly tried and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED that the plaintiffs Arcadio Rodriguez and Jean Rodriguez, take nothing; that this action be dismissed on the merits; and that judgment is hereby entered in favor of defendant, CIGNA Property and Casualty Company, and

553

against plaintiffs, Arcadio Rodriguez and Jean Rodriguez.